Filed 9/23/14  Miller v. Fortune Commercial Corp. CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JOEY MILLER, | B252314 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. LC098458) |
| v. | |
| FORTUNE COMMERCIAL CORPORATION et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of Los Angeles County, Russell S. Kussman, Judge.  Affirmed.

Litigation & Advocacy Group and Glenn A. Murphy for Plaintiff and Appellant.

Weintraub Tobin Chediak Coleman Grodin, Alden J. Parker, Brendan J. Begley and Duyen T. Nguyen for Defendants and Respondents Fortune Commercial Corporation and Fortune Foods Incorporated.

————————————

Appellant Joey Miller appeals the trial court's denial of an injunction. Miller entered defendants Fortune Commercial Corporation and Fortune Foods, Inc.'s. market with his service dog, but was asked to leave. He sought an injunction under the Unruh Civil Rights Act (Civ. Code, § 51 et seq.)[1] and the Disabled Persons Act (§§ 54–55.3) prohibiting defendants from denying him access to its stores and requiring them to post signs on its stores that service dogs were admitted, as well as other relief. The trial court found an insufficient factual basis to support an injunction. We affirm.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

*1.     Factual Background*

Miller, a high school student, is seriously autistic and mentally retarded. He uses a service dog[2] named Roxy to assist him in managing his disability. Defendants own and operate a market chain called "Seafood City."

In August 2012, Miller sought to patronize the Seafood City store in North Hills while with his service dog. Miller was with his stepfather Joseph Scribner. As they entered the market, Scribner heard someone say, "get the dog out of here," because a sign in front of the market stated that "no pets" were allowed in the market. A security guard approached Scribner, who informed the guard that the dog was not a pet but a service dog. The security guard told him to go outside and look at the sign. The sign said, "We love your pets but they are not allowed inside." Scribner once again explained that the dog was not a pet, but the security guard denied them access to the market. Miller and Scribner left the market. Miller admitted in his deposition that Roxy did not have her service dog vest on when they attempted to enter the market.

---

[1] All further statutory references are to the Civil Code unless otherwise indicated.

[2] A "'service dog'" is defined in section 54.1 as a dog that is "individually trained to the requirements of the individual with a disability, including, but not limited to, minimal protection work, rescue work, pulling a wheelchair, or fetching dropped items." (§ 54.1, subd. (b)(6)(C)(iii).)

2

Scribner believed this was an isolated incident because the security guard there did not understand service dogs, so he drove to another Seafood City store in Panorama City. When Scribner and Miller entered the market, Roxy was wearing her service vest. An employee named Winston Lagera confronted them and said, "no dogs." Even after explaining the dog was a service dog, Lagera insisted the dog was not allowed inside the market. Miller and Scribner left the market and observed the sign that stated, "no pets allowed inside the store" and in smaller letters said, "only service dogs are allowed."

Scribner used his cell phone to take a video of the incident. According to Miller, the video depicts Lagera stating, "We don't allow . . . dog[s] inside" and referencing a sign outside the market. Scribner took a second video as he and Miller tried to reenter the market. Lagera asked whether Roxy was a service dog, and when Scribner affirmed that the dog was a service dog, Lagera said, "Okay." Lagera did not tell them to leave the store.

Believing the problem was resolved, Scribner and Miller attempted to buy some food. Minutes later, they were confronted by the manager, Carlo Castaneda, who told them that the dog was not allowed. Scribner took a third video[3] in which he explained to Castaneda that the dog was a service dog and another store employee had said it was okay to bring the dog into the market. Castaneda stated that they could not bring the dog into the market. Castaneda did not believe Roxy was a service dog because she was licking the products (a can of coconut juice). Miller asserted that neither Lagera nor Castaneda had received training in dealing with customers who had service dogs. However, Lagera stated he had received training. Miller asserted the videos refute that Roxy licked any products.

Castaneda testified at deposition that service dogs are permitted in Seafood City. Indeed, in May 2011, Seafood City sent a memorandum to all of its employees reminding

---

[3] The videos are not part of the record, although screen captures from the videos appear in Miller's opening brief and in the motion for a preliminary injunction. Miller apparently refused to produce the videos during discovery.

them of the obligation to permit service dogs in its markets under the Americans with Disabilities Act (ADA).[4] The memorandum pointed out that some service dogs might not be wearing special collars and might not have a license, and an employee in doubt should inquire whether the dog is a service animal. The memorandum was delivered to all Seafood City employees. However defendants will ask a person with a service dog to leave the store if the dog causes problems.

Miller told Scribner that he wanted to return to Seafood City but Scribner has declined to take him back because Scribner believes that if Miller is refused entry again, it will aggravate his autism symptoms.

2.      *Procedural History*

Miller filed his complaint in this action on September 21, 2012.[5] August 29, 2013, Miller moved for a preliminary injunction pursuant to sections 51, 52 and 54 to order defendants to cease and desist enforcing policies that prohibited Miller from entering or shopping at defendant's markets due to his use of a service dog. Miller argued that section 51, subdivision (a) prohibited disability discrimination at business establishments, and that pursuant to section 54.2, subdivision (a), he had a right to use a service dog in a business establishment. Miller further contended that that he had a reasonable likelihood of prevailing at a trial on the merits and he would suffer a greater harm in not being able to enter the markets with his service dog than defendants would suffer if they were required to permit service dogs. As a result, the trial court should issue an injunction to prevent ongoing discrimination against disabled persons with service dogs by permitting

---

[4] In the 1992 reformation of state disability law, the Legislature amended the Unruh Civil Rights Act to incorporate by reference the ADA, making violations of the ADA per se violations of the Unruh Civil Rights Act. (§ 51, subd. (f); *Jankey v. Lee* (2012) 55 Cal.4th 1038, 1044.) "Two overlapping [state] laws, the Unruh Civil Rights Act (§ 51) and the Disabled Persons Act (§§ 54–55.3), are the principal sources of state disability access protection." (*Jankey*, at p. 1044.)

[5] The complaint is not part of the record.

Miller to enter defendants' markets and display a sign that states "SERVICE DOGS WELCOME."

In opposition, defendants argued that the evidence established Miller was asked to leave not because Roxy was a service dog but because she licked some food; Miller could not establish it was likely he would succeed on the merits at trial and Miller could not show irreparable injury because monetary damages are adequate and calculable; and there is no reasonable probability service animals will be denied access to defendants' stores in the future. In reply, Miller contends defendants misrepresented the evidence and that Lagera attempted to exclude Roxy before Roxy licked the can of coconut juice.

On September 24, 2013, the trial court declined to grant an injunction because defendants had a policy of admitting service dogs and the factual disputes indicated there was an insufficient factual basis to justify an injunction.

## DISCUSSION

Miller argues uncontroverted evidence established defendants' employees discriminated against him because of his service dog and thus he established a reasonable probability of prevailing at trial. In particular, he points to defendants' lack of evidence that the 2011 memorandum was actually read by defendants' employees and Lagera's admission he had no training regarding service dogs and thought the store's sign only said "no pets allowed"; and whether Roxy licked the coconut juice did not create a factual dispute because that was not a ground for excluding his service dog from the market. Plaintiff also argues the balance of hardships favors him because his autism will worsen if he is not permitted to shop at Seafood City, while defendants put on no evidence showing any hardship to them in providing signage and admission to their market of service dogs.

"'In determining whether to issue a preliminary injunction, the trial court considers two related factors: (1) the likelihood that the plaintiff will prevail on the merits of its case at trial, and (2) the interim harm that the plaintiff is likely to sustain if the injunction is denied as compared to the harm that the defendant is likely to suffer if the court grants a preliminary injunction.'" (*Take Me Home Rescue v. Luri* (2012) 208 Cal.App.4th 1342,

5

1350–1351.) "The latter factor involves consideration of such things as the inadequacy of other remedies, the degree of irreparable harm, and the necessity of preserving the status quo." (*Abrams v. St. John's Hospital & Health Center* (1994) 25 Cal.App.4th 628, 636.)

Additionally, "[i]njunctive relief is appropriate only when there is a threat of continuing misconduct." (*Madrid v. Perot Systems Corp.* (2005) 130 Cal.App.4th 440, 463.) "[T]he general rule is that an injunction may not issue unless the alleged misconduct is ongoing or likely to recur." "'Injunctive relief has no application to wrongs which have been completed [citation], absent a showing that past violations will probably recur. [Citation.]'" (*Id.* at pp. 464–465.) "The determination [of] whether to grant a preliminary injunction generally rests in the sound discretion of the trial court." (*14859 Moorpark Homeowner's Assn. v. VRT Corp.* (1998) 63 Cal.App.4th 1396, 1402.) "'Discretion is abused when a court exceeds the bounds of reason or contravenes uncontradicted evidence.'" (*Ibid.*)

Two overlapping laws, the Unruh Civil Rights Act (§ 51)[6] and the Disabled Persons Act (§§ 54–55.3),[7] are the principal sources of state disability access protection. The Unruh Civil Rights Act broadly outlaws arbitrary discrimination in public accommodations and includes disability as one among many prohibited bases. (§ 51, subd. (b).) The full panoply of Unruh Civil Rights Act remedies include injunctive relief, actual damages (and in some cases as much as treble damages), and a minimum statutory award of $4,000 per violation. (§ 52, subds. (a), (c)(3); *Turner v. Association of American Medical Colleges* (2011) 193 Cal.App.4th 1047, 1058.) The Disabled Persons

---

[6] Section 51, subdivision (b) states, in part: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, [or] disability . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."

[7] Section 54, subdivision (a) provides in part, "Individuals with disabilities or medical conditions have the same right as the general public to the full and free use of the streets, highways, sidewalks, walkways, public buildings, medical facilities, including hospitals, clinics, and physicians' offices, public facilities, and other public places."

Act substantially overlaps with and complements the Unruh Civil Rights Act. (*Munson v. Del Taco, Inc*. (2009) 46 Cal.4th 661, 675.) More narrow in focus than the Unruh Civil Rights Act, it generally guarantees people with disabilities equal rights of access "to public places, buildings, facilities and services, as well as common carriers, housing and places of public accommodation." (*Munson*, at p. 674, fn. 8; see §§ 54, subd. (a), 54.1, subd. (a)(1).) As with the Unruh Civil Rights Act, the Legislature amended the Disabled Persons Act to incorporate ADA violations and make them a basis for relief under the Act. (§§ 54, subd. (c), 54.1, subd. (d); *Munson*, at p. 674.)

"[A] plaintiff seeking to establish a case under the Unruh Act must plead and prove intentional discrimination in public accommodations in violation of the terms of the Act." (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1175.)

Here, we agree with the trial court that the balancing of the two factors did not support the grant of an injunction because the evidence did not establish an ongoing pattern at Seafood City stores of excluding service animals in violation of sections 51 and 54.5, nor did the balancing of the equities favor plaintiff. The evidence established that Seafood City had a sign outside its Panorama City store that stated service dogs were permitted; Seafood City had a policy of admitting service dogs to its stores and had taken reasonable steps to inform employees of its policy; the trial court was entitled to conclude, based on the evidence, that Seafood City's employees at the Panorama City store admitted Roxy to the store but only expelled her when she became disruptive by licking the coconut juice can; and Roxy was not wearing her service dog vest at the North Hills store when the employee informed plaintiff that no pets were allowed. As a result, plaintiff does not have a reasonable likelihood of prevailing on the merits because these facts do not establish an ongoing pattern of intentional discrimination sufficient to rise to a violation of plaintiff's disability rights, nor does plaintiff's equitable argument that his autism *might* be aggravated warrant the extraordinary remedy of an injunction.

7

## DISPOSITION

The order is affirmed.  Respondents are to recover their costs on appeal.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


ROTHSCHILD, P. J.


MILLER, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.